**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| **NAACP NEW YORK STATE CONFERENCE, JUSTIN COHEN, CHRISTOPHER OLIVER,**<br><br>Plaintiffs,<br><br>v.<br><br>**CITY OF NEW YORK, COMMISSIONER JESSICA S. TISCH,** in her individual and official capacity as Commissioner of the New York City Police Department, **MICHAEL LIPETRI,** in his individual and official capacity as Chief of Department for the New York City Police Department, **ANDREW TRUPIANO, SETURAH BLEASE, ALLEN MOORE, MICHAEL LADUCA, MALIK CLAYBROOKS, JOHN DOE 1-10, JANE DOE 1-2, ANTHONY SALINE, BRENDAN LATIMER, JOHN BATULE, BRYAN SCHEBLEIN, JORGE PEREZ, CHARNEL TABON, GUSTAVO SANTANA, ZHONG YING,**<br><br>Defendants. | <u>**COMPLAINT**</u><br><br>**JURY DEMAND** |

## PRELIMINARY STATEMENT

1.     This civil rights lawsuit challenges the New York City Police Department's racially discriminatory policy of targeting tens of thousands of Black and Latino drivers for unlawful vehicle searches without probable cause or reasonable suspicion (the "Vehicle Search Policy"). These searches continue a long history of the New York City Police Department ("NYPD") intentionally policing Black and Latino communities more harshly based on unsupported

stereotypes of criminality. The NYPD's Vehicle Search Policy violates the United States Constitution, the New York State Constitution, and state and local antidiscrimination laws.

2.      Pursuant to an act of City Council, the NYPD began publishing data on vehicle stops in 2022. This data documents a surge of enforcement activities by NYPD officers under the mayorality of Eric Adams and reflects that the NYPD has rapidly increased its use of vehicle searches over recent years. In 2023, the number of reported vehicle searches was 15,556; by 2024, that number had ballooned to 28,416 searches. This represents a nearly *83 percent increase* over one year.

3.      The burden of this dramatic increase in vehicle searches falls overwhelmingly on Black and Latino New Yorkers as the NYPD disproportionately targets them for such searches. Black or Latino drivers made up over *84 percent* of reported vehicle searches conducted by the NYPD from 2022 through September 2025, while less than *4 percent* of vehicle searches targeted white drivers. Black drivers stopped by NYPD officers have their vehicles searched nearly *ten times more often* than white drivers. Similarly, Latino drivers stopped by NYPD officers have their vehicles searched nearly *six times more often* than white drivers.

4.      These large disparities hold across the city. In all of New York City's 78 police precincts, Black and Latino drivers stopped by officers have their vehicles searched at higher rates than white drivers stopped by the police. Moreover, the NYPD intentionally targets majority Black and Latino precincts for more vehicle searches than majority white precincts. Across precincts, when controlling for crime rates, those with higher Black and Latino populations have significantly higher vehicle search rates. There is no explanation for these disparities other than intentional discrimination against Black and Latino drivers by the NYPD.

5.     The purported reason for the increase in vehicle searches is to confiscate illegal firearms. NYPD policymakers have made it a top priority to get guns off the street by any means necessary. Acting pursuant to this pressure, officers target Black and Latino drivers under the racist assumption that they might be carrying firearms. This echoes how police targeted Black and Latino pedestrians for frisks pursuant to the NYPD's Stop-and-Frisk Policy that was found to be unconstitutional in 2013. Further, much like Stop-and-Frisk, the NYPD's searches of vehicles overwhelmingly fail to produce weapons. Over 96 percent of searches do not result in an arrest for criminal possession of a weapon. Further, although the NYPD disproportionately targets Black and Latino drivers for vehicle searches, searches of white drivers are more likely to lead to arrests for criminal possession of a weapon.

6.     A central feature of the NYPD's Vehicle Search Policy is the use of "anti-crime" units to aggressively target Black and Latino drivers in minority neighborhoods for unlawful vehicle searches. Officers in these units patrol Black and Latino neighborhoods in unmarked vehicles and conduct unlawful vehicle searches based on racist stereotypes that Black and Latino drivers are likely to be carrying firearms in their vehicles. These units, which were responsible for the 1999 killing of Amadou Diallo, a Black immigrant in the Bronx, were disbanded by former Mayor Bill DeBlasio and reconstituted by former Mayor Adams. The units continue in the current mayoralty and are a core element of the NYPD's, Defendant Police Commissioner Jessica Tisch's and Defendant Chief of Department Michael LiPetri's efforts to over-police neighborhoods of color with vehicle searches.

7.     Individual plaintiffs Justin Cohen and Christopher Oliver are Black drivers who have been subjected to unlawful vehicle searches by NYPD officers based solely on their racial identity and pursuant to the Vehicle Search Policy.

8.      Mr. Cohen was driving in the Bronx when NYPD officers from an "anti-crime" unit stopped him for an alleged traffic violation. Officers then searched his vehicle without reasonable suspicion or probable cause, arrested him, and locked him in a cell at a police precinct while searching his car again.

9.      NYPD officers, including those in the "anti-crime" units, have repeatedly stopped Mr. Oliver for alleged minor traffic violations and, on at least four occasions, made him exit his vehicle and then searched it without probable cause or reasonable suspicion before allowing him to return to his car.

10.     Police did not recover weapons in any of the searches of Mr. Cohen's or Mr. Oliver's vehicles, and none of these encounters resulted in misdemeanor or felony charges.

11.     The individual plaintiffs are joined by organizational plaintiff the National Association for the Advancement of Colored People New York State Conference ("NAACP NYS"), a long-standing civil rights organization that primarily uses policy advocacy to advance the equal treatment of New York's people of color. Over recent years, NAACP NYS has been forced to divert resources away from legislative advocacy toward directly responding to New Yorkers of color who have been racially profiled pursuant to the NYPD's Vehicle Search Policy.

12.     The NYPD's widespread pattern and practice of conducting intentionally discriminatory, warrantless vehicle searches violates the Fourth and Fourteenth Amendments of the United States Constitution, the corresponding provisions of the New York State Constitution, and New York City's Community Safety Act. Plaintiffs seek a declaratory judgment that the Vehicle Search Policy is illegal and a permanent injunction against the continued enforcement of the unconstitutional practices core to the Vehicle Search Policy. Mr. Cohen and Mr. Oliver also seek monetary damages for injuries stemming from the NYPD's violations of their rights.

## PARTIES

13.    Plaintiff NAACP NEW YORK STATE CONFERENCE is a nonprofit, nonpartisan membership organization in New York with 12 branches across New York City. NAACP NYS is the New York state affiliate of the National Association for the Advancement of Colored People, a national civil rights organization.

14.    Plaintiff JUSTIN COHEN is a Black resident of Westchester County, New York.

15.    Plaintiff CHRISTOPHER OLIVER is a Black resident of New York City.

16.    Defendant the CITY OF NEW YORK is a municipal corporation duly incorporated and existing pursuant to the laws of the State of New York. The City of New York has established and maintains the NYPD as a constituent department or agency.

17.    Defendant JESSICA S. TISCH is the Police Commissioner of New York City. Commissioner Tisch has final policymaking authority with respect to the NYPD. Since becoming the NYPD's Police Commissioner in 2024, Commissioner Tisch has known about and endorsed the NYPD's Vehicle Search Policy by promoting officers directly responsible for enforcing it, and by deliberately failing to take steps to prevent officers from conducting racially discriminatory vehicle searches without sufficient individualized suspicion. Commissioner Tisch has overseen the Vehicle Search Policy. Commissioner Tisch is sued in her individual and official capacity.

18.    Defendant MICHAEL LIPETRI is the Chief of Department for the NYPD. As the policymaker responsible for designing, leading, implementing, and overseeing the NYPD's policing plans and crime control strategies, Chief LiPetri has directed the deployment of police officers to Black and Latino neighborhoods to engage in unconstitutional vehicle searches of Black and Latino drivers. Chief LiPetri deliberately failed to take steps to prevent officers from conducting racially discriminatory vehicle searches without sufficient legal justification and has,

along with Commissioner Tisch, overseen the Vehicle Search Policy. Chief LiPetri is sued in his individual and official capacity.

19.     Defendant Officer ANDREW TRUPIANO (Tax 969403) is an active police officer with the NYPD who participated in the encounter with Plaintiff Christopher Oliver described in paragraphs 123-135. He is being sued in his official and individual capacity.

20.     Defendant Officer SETURAH BLEASE (Tax 967777) is an active police officer with the NYPD who participated in the encounter with Plaintiff Christopher Oliver described in paragraphs 123-135. She is being sued in her official and individual capacity.

21.     Defendant Sergeant ALLEN MOORE (Tax 950912) is an active police officer with the NYPD who participated in the encounter with Plaintiff Christopher Oliver described in paragraphs 123-135. He is being sued in his official and individual capacity.

22.     Defendant Officer MICHAEL LADUCA (Tax 963598) is an active police officer with the NYPD who participated in the encounter with Plaintiff Christopher Oliver described in paragraphs 136-142. He is being sued in his official and individual capacity.

23.     Defendant Officer MALIK CLAYBROOKS (Tax 965000) is an active police officer with the NYPD who participated in the encounter with Plaintiff Christopher Oliver described in paragraphs 143-151. He is being sued in his official and individual capacity.

24.     Defendant Officers JOHN DOES 1–10 are members of the NYPD whose full identities are not known to Plaintiff Christopher Oliver, but who are or were employed as police officers by the NYPD. Officers John Does 1-5 participated in the encounters with Mr. Oliver described in paragraphs 114-122. Officers John Does 6-7 participated in the encounters with Mr. Oliver described in paragraphs 123-135. Officers John Does 8-9 participated in the encounters with Mr. Oliver described in paragraphs 136-142. Officer John Doe 10 participated in the

encounters with Mr. Oliver described in paragraphs 143-151. They are sued in their official and individual capacities.

25.     Defendant Officers JANE DOES 1–2 are members of the NYPD whose full identities are not known to Plaintiff Christopher Oliver but who are or were employed as police officers by the NYPD and participated in the encounters with Mr. Oliver described in paragraphs 114-122. They are both sued in their official and individual capacities.

26.     Defendant Police Officer ANTHONY SALINE (Tax 962081) is a former police officer for the NYPD who participated in the encounter with Plaintiff Justin Cohen described in paragraphs 153-189. He is being sued in his individual capacity.

27.     Defendant Police Officer BRENDAN LATIMER (Tax 965253) is an active police officer for the NYPD who participated in the encounter with Plaintiff Justin Cohen described in paragraphs 153-189. He is being sued in his official and individual capacity.

28.     Defendant Police Officer JOHN BATULE (Tax 963863) is an active police officer for the NYPD who participated in the encounter with Plaintiff Justin Cohen described in paragraphs 153-189. He is being sued in his official and individual capacity.

29.     Defendant Police Officer BRYAN SCHEBLEIN (Tax 955457) is an active police officer for the NYPD who participated in the encounter with Plaintiff Justin Cohen described in paragraphs 153-189. He is being sued in his official and individual capacity.

30.     Defendant Police Officer JORGE PEREZ (Tax 959886) is an active police officer for the NYPD who participated in the encounter with Plaintiff Justin Cohen described in paragraphs 153-189. He is being sued in his official and individual capacity.

31.     Defendant Police Officer CHARNEL TABON (Tax 970249) is an active police officer for the NYPD who participated in the encounter with Plaintiff Justin Cohen described in paragraphs 153-189. He is being sued in his official and individual capacity.

32.     Defendant Police Officer GUSTAVO SANTANA (Tax 973758) is an active police officer for the NYPD who participated in the encounter with Plaintiff Justin Cohen described in paragraphs 153-189. He is being sued in his official and individual capacity.

33.     Defendant Sergeant ZHONG YING (Tax 937772) is an active police officer for the NYPD who participated in the encounter with Plaintiff Justin Cohen described in paragraphs 153-189. He is being sued in his official and individual capacity.

## FACTUAL ALLEGATIONS

**The NYPD's Vehicle Search Policy Intentionally Targets Black and Latino Drivers for Unlawful Vehicle Searches.**

34.     Every year, NYPD officers stop hundreds of thousands of drivers across New York City. Of those who have their cars stopped, a subset is searched. The vast majority are Black or Latino. The racial disparity in the unlawful search of vehicles is directly attributable to the NYPD's unconstitutional Vehicle Search Policy.

35.     The NYPD's Vehicle Search Policy is motivated by the racially discriminatory belief that Black and Latino drivers are likely to have weapons in their vehicles. As a result, NYPD officers conduct searches of Black and Latino drivers' vehicles at disproportionate rates. They do so without probable cause to believe that those cars contain contraband or reasonable suspicion to believe the vehicle's occupants are dangerous or have a weapon nearby.

36.     These fishing expeditions almost never turn up weapons or contraband.

37.     The NYPD's Vehicle Search Policy is so widespread and frequent as to constitute a custom and usage of the NYPD.

### *Increasing NYPD Vehicle Searches*

38.     Over the last four years, New York City has seen a drastic increase in the policing of drivers. From 2022 through 2024, the NYPD reported an increase in vehicle searches each year.[1] In 2022, the NYPD recorded 13,340 vehicle searches. In 2023, it reported 15,556 vehicle searches, a more than 16 percent increase from the year prior. In 2024, the number skyrocketed to 28,416 reported vehicle searches, a more than 82 percent increase from the year prior and a 113 percent increase from 2022. Through September 2025, the last period of time for which full data has been released, the NYPD again reported more vehicle searches than during the entirety of 2022 or of 2023.

### *Large Racial Disparities in Vehicle Searches*

39.     In New York City, approximately 94 percent of traffic stops result in the issuance of a traffic ticket and nothing more. The share of Black, Latino, and white drivers who receive a traffic ticket is generally consistent with the demographics of drivers stopped by police.[2]

40.     While most vehicle stops do not lead to further enforcement actions beyond the issuance of a ticket, the racial disparities in whose cars the NYPD targets for vehicle searches are stark.

41.     From January 2022 through September 2025, *over 84 percent* of the vehicle searches conducted by the NYPD targeted Black or Latino drivers. Less than *4 percent* of the

---

[1] 2022 was the first year for which the NYPD began to record and publish vehicle stop data pursuant to a 2021 amendment to Local Law 45.

[2] While the NYPD *issues* traffic tickets at a generally consistent rate for white, Black, and Latino drivers, the data indicates that the NYPD *stops* Black and Latino drivers at a much higher rate than the share of Black and Latino drivers in New York City. This lawsuit does not challenge the NYPD's discriminatory traffic stops.

vehicles searched were operated by white drivers. Figure 1 (below) shows the racial breakdown of vehicle searches conducted by NYPD officers for Black, Latino, and white drivers.

**Figure 1**



42.    These search-rate disparities are disproportionate to the rates at which the various racial groups drive in New York. For example, as illustrated in Figure 2 (below), the NYPD searches Black and Latino drivers at rates dramatically disproportionate to the percentage of Black and Latino drivers commuting to work. According to the 2023 Five-Year American Community Survey conducted by the United States Census Bureau, 37.9 percent of people commuting to work by car from anywhere in the New York City metropolitan area are white, while 23.3 percent are Latino, and only 22.3 percent are Black. Yet over 53 percent of vehicle searches are conducted on Black drivers' vehicles.

**Figure 2**



43.    The extreme disparity between the rate at which Black people drive in New York City and the rate at which Black drivers are subject to vehicle searches by the NYPD cannot be explained by disparities in the racial demographics of drivers stopped by police.

44.    From January 2022 through September 2025, Black drivers were the subject of 29.2 percent of traffic stops, Latino drivers were the subject of 27.7 percent of traffic stops, and white drivers were the subject of 20 percent of traffic stops. However, over the same period, Black drivers were the subject of 53.6 percent of vehicle searches, Latino drivers were the subject of 30.6 percent of vehicle searches, and white drivers were the subject of 3.8 percent of vehicle searches.

**Figure 3**



45.     Of the nearly 3 million vehicle stops between January 2022 and September 2025, the NYPD searched 4.69 percent of stopped cars operated by Black drivers; 2.82 percent of stopped cars operated by Latino drivers; and only 0.48 percent of stopped cars operated by white drivers. Thus, a Black driver stopped by police is almost *10 times* more likely to have their car searched by the NYPD than a white driver is during a traffic stop. A Latino driver stopped by police is almost *6 times* more likely to have their car searched by the NYPD than a white driver is during a traffic stop. Figure 4 (below) illustrates this severe disparity.

**Figure 4**



*The Vehicle Search Policy*

46.     These disparities are not occurring by chance. They are directly attributable to the NYPD's practice of intentional racial profiling in deciding whose vehicle to search. This discriminatory targeting is purportedly aimed at recovering guns based on the racist stereotype that certain Black and Latino individuals are likely to be carrying guns. Former Mayor Adams made it a top priority of his administration to recover firearms by all means. He appointed Commissioner Tisch to lead those efforts and she remains police commissioner under the current mayoral administration.

47.     Encounters that happen under the Vehicle Search Policy frequently begin when officers either pull over moving vehicles or approach stopped vehicles because drivers have allegedly engaged in minor traffic infractions. These infractions can include failing to use a signal when turning or changing lanes, having a broken brake light, allegedly having tinted windows that are too dark, or even having a license plate that is not properly illuminated. The New York Vehicle

and Traffic Law contains over 200 such infractions, giving police officers almost unlimited discretion to pull over or approach any driver.

48.     After running a license, NYPD officers disproportionately ask Black and Latino drivers, and any passengers, to exit their vehicles, with no reasonable basis to believe that anyone in the vehicle is armed or poses a danger to officer safety. Upon exiting the vehicle, officers will often subject them to frisks—again, with no basis to believe that they are armed. Being ordered out of a car is often a humiliating experience for individuals and being subject to a frisk amplifies that dignitary harm.

49.     Pursuant to the NYPD's Vehicle Search Policy, NYPD officers search vehicles whenever they have a hunch that a stopped vehicle might contain a weapon—regardless of the evidence or lack thereof to support such a hunch. These hunches are based on racial stereotypes and inadequate training. The Vehicle Search Policy thus targets vehicles driven by Black and Latino people when officers lack the required probable cause to believe that evidence of a crime is contained within the vehicle or reasonable suspicion that anyone being stopped is dangerous and may gain immediate control of a weapon.

50.     The data shows that these racially motivated hunches are almost always wrong, further demonstrating the discriminatory nature of the policy. The vast majority of these searches do not lead to the recovery of weapons. Over *96 percent* of vehicle searches conducted by the NYPD between January 1, 2022 and September 30, 2025 did not lead to an arrest for criminal possession of a weapon.

51.     The targeting of Black and Latino drivers for searches is consistent with the NYPD's "Stop-and-Frisk Policy," which targeted Black and Latino pedestrians for unlawful searches on the street. That policy was also based on the unsupported stereotype that Black and

Latino men are likely to be carrying firearms and that by stopping, frisking, and searching them, the NYPD could reduce gun violence. In reference to the Stop-and-Frisk Policy, former NYPD Commissioner Raymond Kelly told then State Senator Eric Adams that the NYPD focused on Black and Latino men "because [it] wanted to instill fear in them, every time they leave their home, they could be stopped by the police."

52.    Just like with the Vehicle Search Policy, the Stop-and-Frisk Policy rarely recovered weapons. And, as with the Vehicle Search Policy, officers who searched white people were more likely to recover weapons than when they searched Black and Latino pedestrians—even though Black and Latino people were searched at vastly higher rates.

53.    In 2013, a federal court in *Floyd v. City of New York* found that the NYPD's Stop-and-Frisk Policy was unconstitutional. The NYPD is still under a federal monitorship to reform its Stop-and-Frisk Policy (the "Stop-and-Frisk Monitorship") and has not yet demonstrated substantial compliance with either the Fourth Amendment or the Fourteenth Amendment in its pedestrian stops.

### *Targeted Deployments and Enforcement Under the Vehicle Search Policy*

54.    A critical aspect of the Vehicle Search Policy is where officers are deployed to conduct the searches. The two main deployment patterns are the targeting of drivers in majority Black and Latino neighborhoods and the use of so-called "anti-crime" units to conduct racially targeted vehicle searches in minority neighborhoods.

55.    Indeed, in 2025, when NYPD Director of Legislative Affairs Joshua Levin and Transportation Bureau Chief Olufunmilola Obe were asked by New York City Council what was causing the racial disparities in vehicle searches, they testified that it was due to deployment

practices and the NYPD's use of "precision policing" to deploy officers to minority neighborhoods.

*The NYPD Targets Drivers in Majority Black and Latino Neighborhoods for Vehicle Searches.*

56.    As part of its Vehicle Search Policy, the NYPD intentionally targets Black and Latino neighborhoods for increased numbers of vehicle searches.

57.    The NYPD searches vehicles stopped by the police much more frequently in majority Black and Latino neighborhoods than in other parts of the city. These disparities in search rates are illustrated in Figure 5, which maps the vehicle search rate by precinct across the city, and Figure 6, which maps the racial demographics of NYPD precincts. In precincts where the majority of residents are Black or Latino, the NYPD searches drivers stopped by police at a higher rate than in the city as a whole.

**Figures 5 and 6**



58.    The three precincts with the highest rates of vehicle searches are: the 113th Precinct, where 83 percent of residents are Black or Latino; the 73rd Precinct, where 89 percent of

residents are Black or Latino; and the 46th Precinct, where 94 percent of residents are Black or Latino. In each of these three precincts, the NYPD searches over 7.4 percent of vehicles stopped by police, as compared to 2.6 percent of vehicles stopped citywide. Additionally, in each of these precincts, the NYPD searched the vehicles of over 10 percent of Black drivers stopped by police.

59.    White people make up no more than 7 percent of the population in each of the twelve police precincts with the highest reported levels of vehicle search rates.

60.    These differences also cannot be explained by disparities in crime rate. Even when controlling for commonly used crime rate variables (as measured by index crime complaint rates, crime complaint rates, arrest rates, and shooting rates) across New York City police precincts, traffic stops lead to vehicle searches at an increasingly higher rate in precincts with larger shares of Black and Latino residents. Race, not crime, is thus tied to higher vehicle search rates citywide in Black and Latino communities pursuant to the Vehicle Search Policy.

61.    The NYPD can easily target its enforcement and deployment patterns in this racially discriminatory way because while New York City is diverse, its neighborhoods are often very segregated. These segregation patterns are longstanding, well known, and result from both intentionally and unintentionally discriminatory actions, including redlining. Accordingly, New York City neighborhoods and police precincts serve as proxies for race.

62.    Targeted enforcement in Black and Latino neighborhoods pursuant to the Vehicle Search Policy is consistent with the NYPD's long history of policing Black and Latino neighborhoods more aggressively than the rest of the city.

63.    For example, in the early 2000s, the NYPD began a program known as "Operation Impact" where it would designate certain areas as "impact zones." Once an area was designated an "impact zone," the NYPD would flood that area with inexperienced police officers. These

impact zones were majority Black and Latino neighborhoods. Academic researchers found that, as a result of Operation Impact, "[f]or blacks, impact-zone formation increases arrests, summons, and frisks. For Hispanics, impact-zone formation increases arrests, frisks, and street detention (hands placed on walls). For other races, impact-zone formation [did] not significantly change . . . the risk of any outcome."

64.    An academic study on where police vehicles are deployed also corroborates that the NYPD polices Black and Latino neighborhoods more heavily. A 2023 study by researchers at Cornell University found substantial racial disparities in the deployment of marked NYPD cars in residential neighborhoods. Black and Latino residents face police deployment levels approximately 1.08 times the city average, as compared to approximately 0.95 times for white residents. Even without restricting to residential zones, the study found, "Black and [Latino] residents face higher police deployments."

65.    This finding is consistent with findings made in 2013 regarding the NYPD's unconstitutional Stop-and-Frisk Policy. The federal court found that for pedestrian stops, "the NYPD carrie[d] out more stops in areas with more black and Hispanic residents . . . [and] the best predictor for the rate of stops in a geographic unit . . . [was] the racial composition of that unit rather than the known crime rate." Further, "regardless of [a geographical unit's] racial composition, blacks and Hispanics [were] more likely to be stopped than whites."

66.    Disparities in the rates at which cars operated by Black and Latino drivers are searched by police are not solely driven by deployment patterns. The NYPD is more likely to search vehicles driven by Black and Latino drivers than white drivers, regardless of where in the city the stops and searches occur.

18

*The NYPD Uses "Anti-Crime" Units to Conduct Racially Targeted Vehicle Searches.*

67.    Pursuant to the Vehicle Search Policy, the NYPD uses its "anti-crime" units to engage in proactive policing to aggressively target Black and Latino drivers. Because these units have been tasked with attempting to get weapons off the streets through aggressive policing tactics, they often pull over Black and Latino drivers and search their vehicles without probable cause or reasonable suspicion.

68.    The current iteration of the NYPD's "anti-crime" units includes the Neighborhood Safety Teams ("NSTs") and Community Response Teams ("CRTs").[3] These specific units were created during the Adams administration but there is a long and disturbing history of the use of such units in unlawful and aggressive policing against Black and Latino New Yorkers. In 1999, officers in an "anti-crime" unit murdered West African immigrant Amadou Diallo by shooting him 41 times as he reached for his wallet. In 2014, NYPD officer Daniel Pantaleo was working as an "anti-crime" officer in Staten Island when he murdered a Black man named Eric Garner by placing him in a chokehold. "Anti-crime" units were also integral to the unconstitutional Stop-and-Frisk Policy. As alleged, *infra*, both individual plaintiffs have been searched by officers assigned to these units.

69.    These "anti-crime" units are distinct from normal patrol officers in that they often drive unmarked cars and wear a form of "plain-clothes" uniform. Another core element of the units is that they are deployed to minority neighborhoods to engage in aggressive policing. For example, officers in NST units patrol 34 majority Black and Latino police precincts and are generally focused on removing illegal guns off the street.

---

[33] Initially, there was a secretive unit known as a Public Safety Team ("PST"), but the NYPD has reported that this unit has been incorporated into the other "anti-crime" units.

70.    The NYPD's "anti-crime" units are also rife with misconduct. For example, more than half of the officers assigned to the CRT have been found to have engaged in misconduct at least once in their career, and more than 40 have three or more cases of substantiated misconduct. As an NYPD senior officer stated in public reporting, "It's not like they're taking the best of the best . . . They're grabbing a bunch of cowboys and just letting them loose on the city."

71.    The officers in the specialized units have demonstrated particularly poor compliance with Fourth Amendment protections when engaging in stops, frisks, and searches. In 2025, the monitor that was appointed to oversee the reforms to the NYPD's Stop-and-Frisk policy (the "Monitor") found that, "[l]ike NST [ ] officers, CRT officers stopped, frisked, and searched individuals unlawfully at higher rates than patrol officers" and that over 40 percent of the searches they engaged in were unlawful. In 2023, the Monitor concluded that "NST [ ] officers are not performing stops, frisks, and searches at constitutional levels, and that supervisors of NST [ ] and patrol officers are not appropriately overseeing their officers."

72.    While the Monitor's reports analyze both pedestrian and vehicle stops, she has found through her audits that much of the activity of these "anti-crime" units is geared at unconstitutionally policing drivers of color.

73.    The Monitor's 2025 report on CRT stated that, "[t]he majority of CRT encounters reviewed for this audit were traffic stops resulting from Vehicle Traffic Law [ ] violations." Similarly, the Monitor's review of NST activity found that the majority of stops she reviewed involved vehicle stops. Specifically, the Monitor reported that, "[o]f the 697 videos reviewed by the Monitor team, 399 involved car stops (57%). Officers searched the vehicle in 129 of the 399 car stops (32.3%) conducted by the NST officers." The vast majority of audited car stops did not lead to recovery of contraband.

74.    The Monitor's 2022 NST Audit revealed that the majority of stops performed by the NSTs involved stopping cars for Vehicle and Traffic Law violations. Further, of the 230 vehicle stops that the Monitor reviewed, only two resulted in the recovery of weapons. The Monitor concluded that "[d]espite training and experience, NST officers overall appear to be stopping, frisking, and searching individuals at an unsatisfactory level of compliance. Too many people are stopped, frisked, and searched unlawfully. At the precinct level, sergeants, lieutenants, and commanding officers fail to identify and correct the unconstitutional policing. The Department's oversight of these unlawful NST stops, frisks, and searches is inadequate at all levels."

75.    The Monitor's reports corroborate allegations made by former interim Police Commissioner Thomas Donlon that the "anti-crime" units like CRT are "used to harass, injure, and violate the rights of civilians, particularly in communities of color, with no regard for constitutional safeguards."

76.    Indeed, former NYPD Chief of Risk Management Matthew Pontillo in a 2023 audit raised constitutional concerns about the behavior of the "anti-crime" units, specifically CRT. In public reporting, Chief Pontillo stated that he "threw red flags" and raised "constitutional concerns" that were ignored within the NYPD, and he was subsequently forced to resign.

**NYPD Commissioner Tisch and Chief LiPetri Have Endorsed the Targeting of Black and Latino Drivers and Neighborhoods for Unlawful Vehicle Searches.**

77.    NYPD Police Commissioner Tisch has final authority over the NYPD's policing policies.

78.    Commissioner Tisch has described her priority as being to "get the guns."

79.    Commissioner Tisch has personally heralded and approved the NYPD's efforts to confiscate weapons, including under the Vehicle Search Policy.

80.     Commissioner Tisch is also knowledgeable of and has endorsed the deployment of NYPD officers and "anti-crime" units into predominantly Black and Latino neighborhoods under the pretext of "precision policing."

81.     On October 8, 2025, Commissioner Tisch appointed Michael LiPetri as interim Chief of Department for the NYPD. In December 2025, Chief LiPetri was officially promoted to Chief of Department. Prior to assuming this position, Chief LiPetri was employed as the NYPD's Bureau Chief of Crime Control Strategies.

82.     Chief LiPetri has been dubbed "the architect" of the NYPD's crimefighting strategies. He is responsible for designing, leading, implementing, and overseeing the NYPD's policing plans and strategies, including the deployment of officers to target Black and Latino precincts.

83.     Chief LiPetri personally "went to the police commissioner" to devise the NYPD's street crime policing tactics. Like Commissioner Tisch, Chief LiPetri has also prioritized finding and confiscating guns.

84.     Together, Commissioner Tisch and Chief LiPetri created and perpetuated the NYPD's policing strategies around weapons confiscation.

85.     Former Mayor Adams "commend[ed] Commissioner Tisch . . . and Chief LiPetri" for "putting together the crime strategy" around weapons confiscation.

86.     The crime strategy that Commissioner Tisch and Chief LiPetri developed and implemented includes the NYPD's Vehicle Search Policy.

**Improper and Inadequate Policies, Training, and Supervision Perpetuate the Vehicle Search Policy.**

87.     The NYPD's policies governing vehicle searches are inadequate and fail to provide officers with the necessary instruction on when they may legally conduct a warrantless search of a vehicle.

88.     The NYPD Patrol Guide includes no policies specifying the circumstances under which officers may conduct a lawful warrantless search of a vehicle.

89.     NYPD officers lack proper training on conducting lawful warrantless searches of vehicles.

90.     On information and belief, the NYPD trains and instructs officers that a "hunch" as to the presence of a firearm is a sufficient basis on which to search a vehicle regardless of the basis for that hunch and regardless of whether the officers have a constitutionally sufficient basis to conduct a search.

91.     The inadequacy of NYPD supervision and training with respect to vehicle searches is exacerbated by the pressure that Commissioner Tisch and other officials have placed on NYPD officers to seize illegal firearms.

92.     The inadequacy of NYPD supervision and training with respect to vehicle searches is exacerbated by the NYPD's excessive deployment of police and "anti-crime" units to majority Black and Latino precincts, a longstanding NYPD practice.

**The NYPD Is Deliberately Indifferent to the Unconstitutional Vehicle Search Policy and to Its Failure to Train and Supervise Officers Engaged in Vehicle Searches.**

93.     The defendants are aware that the Vehicle Search Policy leads to unconstitutional vehicle searches of drivers and have not attempted to remedy that and have not adequately disciplined officers for their unlawful conduct.

94.     Recognizing the NYPD's culture of impunity toward biased policing, the New York City Council took the extraordinary measure of amending the City Charter in 2022 to ensure that the independently run New York City Civilian Complaint Review Board ("CCRB") reviews and investigates civilian complaints of biased policing, which it had previously referred to the NYPD's Internal Affairs Bureau.

95.     This law was passed after a damning report by the NYPD's own inspector general found that the NYPD had sustained zero complaints of biased policing over the course of more than four years from 2014 to June 2019, along with a plethora of other investigative deficiencies within the Internal Affairs Bureau that contributed to officer impunity for serious misconduct.

96.     From the beginning of 2022 through the completion of the quarter ending June 2025, the CCRB received at least 1,536 complaints alleging an officer engaged in an "Abuse of Authority" related to a vehicle search. Upon information and belief, the CCRB has substantiated at least 100 of these complaints.

97.     Despite the repeated filing of civilian complaints with the CCRB, the NYPD has failed to meaningfully discipline officers who conduct or assist in unlawful vehicle searches. The NYPD's disregard for CCRB findings and the NYPD's failure to discipline officers who perform illegal vehicle searches is an element of an NYPD-wide failure to investigate and discipline officers whose actions violate the Fourth and Fourteenth Amendment, the New York State Constitution, and state and local antidiscrimination laws.

98.     In a report published on September 19, 2024, titled "Report to the Court on Police Misconduct and Discipline," and pursuant to the Stop-and-Frisk Monitorship, retired New York County Supreme Court Judge James Yates, a monitoring team member, reported that "officers rarely, if ever, receive a penalty (lost vacation days, suspension, dismissal probation, termination,

formal reprimand) for unconstitutional stops/frisks/or searches—even when substantiated by CCRB."

99.    Judge Yates found that this failure to discipline is rooted in the NYPD's lack of a response to misconduct that violates the Fourth and Fourteenth Amendments. "In sum, a significant effort is made, and significant resources are expended, by the NYPD to investigate misconduct claims in general. However, the same cannot be said of disciplinary efforts regarding compliance with the Fourth and Fourteenth Amendments. Discipline for illegal stops and frisks, even when substantiated by CCRB, is not pursued with the same vigor and resolve as for other misconduct. Penalties for wrongdoing involving stops, questions, frisks, or searches of persons [ ] even when repeated, are rare."

100.    As noted by Judge Yates, this failure to discipline NYPD officers for Fourth and Fourteenth Amendment violations is a longstanding practice originating at the top of the NYPD: "[V]arious Police Commissioners, over time, have demonstrated an inordinate willingness to excuse illegal stops, frisks, and searches in the name of 'good faith' or 'lack of mal-intention,' relegating Constitutional adherence to a lesser rung of discipline."

101.    Because the Police Commissioner has final authority over all discipline, the NYPD's deliberate indifference to both reported and substantiated allegations of illegal vehicle searches is attributable to Commissioner Tisch and the architect of the NYPD's policing strategy, Chief LiPetri.

102.    The NYPD has also resisted repeated efforts to remedy racial discrimination and bias-based policing throughout the NYPD since the conclusion of the Stop-and-Frisk litigation. Recently, from January to June 2025, the CCRB substantiated several complaints of racially biased policing. Police Commissioner Tisch retained jurisdiction over five cases involving eight officers

where the CCRB requested that significant disciplinary action be commenced against the officers. Police Commissioner Tisch disagreed and failed to significantly punish the officers despite the CCRB's finding of biased policing.

103.    The Monitor has repeatedly admonished the NYPD's failure to even begin to develop accountability mechanisms to ensure officers comply with Fourteenth Amendment orders from the 2013 court rulings.

104.    The NYPD's failure to train or discipline its officers and its decision to allow sergeants with histories of misconduct to supervise officers engaged in the Vehicle Search Policy exemplify a deliberate indifference to unconstitutional policing at the highest levels of the NYPD and City Hall.

**Pursuant to the Vehicle Search Policy, the NYPD Has Subjected Individual Plaintiffs Christopher Oliver and Justin Cohen to Discriminatory Vehicle Searches.**

### *Plaintiff Christopher Oliver*

105.    Christopher Oliver is a 30-year-old Black man who lives in New York City.

106.    Mr. Oliver is routinely stopped by NYPD officers while driving in New York City, and officers have illegally searched his vehicle without his consent multiple times pursuant to the Vehicle Search Policy. Officers have used these encounters as opportunities to harass, question, and humiliate Mr. Oliver.

107.    The officers did not recover any firearms or contraband from Mr. Oliver's vehicle or his person during any of the four below-listed searches.

108.    In each of these four illegal searches of Mr. Oliver's car, the NYPD did not even issue Mr. Oliver a traffic ticket and allowed him to return to his vehicle after the search.

109.    In each instance, officers lacked any legally sufficient reason for searching Mr. Oliver's vehicle. Instead, the officers' searches of Mr. Oliver's vehicle were motivated by racial discrimination.

110.    The NYPD's failure to discipline, supervise, and train the officers involved in the violations of Mr. Oliver's civil rights contributed to his injuries.

111.    As a result of the NYPD's repeated violations of Mr. Oliver's rights pursuant to the Vehicle Search Policy, he now fears being stopped and searched by the police. He feels as though he is being targeted by the NYPD and becomes nervous whenever he notices an NYPD car behind his vehicle. These abuses have also impacted when and where Mr. Oliver is comfortable driving throughout New York City. Currently, he continues to drive throughout New York City.

**April 9, 2025**

114.    On the afternoon of April 9, 2025, Mr. Oliver was approached by approximately seven NYPD officers while sitting in his parked vehicle at or near the corner of Rutgers Street and Madison Street in Manhattan.

115.    The identities of the officers are unknown to Mr. Oliver, but they are or were employed as police officers by the NYPD and participated in the April 9, 2025 encounter with Mr. Oliver.

116.    Upon information and belief, each officer—Officer John Doe 1, Officer John Doe 2, Officer John Doe 3, Officer John Doe 4, Officer John Doe 5, Officer Jane Doe 1, and Officer Jane Doe 2—is or was assigned to one of the NYPD's Community Response Teams.

117.    Two white male officers (Officer John Doe 1 and Officer John Doe 2) and one female officer (Officer Jane Doe 1) approached Mr. Oliver on the driver's side of his vehicle, instructed him to exit his vehicle, and then instructed him to walk to the area behind his vehicle.

118.    A Black male officer (Officer John Doe 3) then physically grabbed Mr. Oliver and began speaking to Mr. Oliver in the area behind Mr. Oliver's vehicle.

119.    While Officer John Doe 3 spoke to Mr. Oliver, Officer John Doe 2 and a white female officer (Officer Jane Doe 2) opened the driver's side and passenger's side doors to Mr. Oliver's car, respectively.

120.    The two officers climbed into Mr. Oliver's vehicle from each side and searched his vehicle and rummaged in and around the areas in the front of Mr. Oliver's vehicle.

121.    Mr. Oliver did not consent to the search of his vehicle.

122.    The officers did not recover any contraband from Mr. Oliver's vehicle, did not formally arrest Mr. Oliver, and did not issue Mr. Oliver a criminal summons or traffic summons.

### November 13, 2024

123.    On November 13, 2024, at or around 8:05 PM, Mr. Oliver was driving his vehicle in Manhattan on Columbus Avenue at or near the corner of 93rd Street. Mr. Oliver had three passengers in the car.

124.    Mr. Oliver was pulled over by approximately five NYPD officers in two unmarked NYPD vehicles. NYPD paperwork indicates that the officers involved in this encounter include: Officer Andrew Trupiano; Officer Seturah Blease; and Sergeant Allen Moore. The identities of the other officers (Officer John Doe 6 and Officer John Doe 7) are unknown to Mr. Oliver.

125.    Once Mr. Oliver pulled over, a white male officer asked him for his license and registration, which Mr. Oliver provided.

126.    The officer informed Mr. Oliver that he stopped him because his windows were allegedly tinted beyond the legal limit.

127.    During this interaction, Mr. Oliver noticed that the other officers were looking into the car from outside.

128.    The officers then ordered Mr. Oliver and the passengers to exit the vehicle.

129.    Once Mr. Oliver was outside of the vehicle, the officers frisked him. Mr. Oliver was then told to wait behind the back of his car.

130.    The officers, including Officer Blease, then searched Mr. Oliver's vehicle.

131.    The officers did not ask for Mr. Oliver's consent to search, nor did Mr. Oliver provide consent.

132.    The accompanying "Stop Report" completed by Officer Blease confirms these facts. However, the "Vehicle Report" completed by Officer Trupiano incorrectly asserts that Mr. Oliver's vehicle was not searched at all.

133.    The Stop Report completed by Officer Blease further confirms that she searched Mr. Oliver's car and confirmed that no gun, weapon, or other contraband was recovered from Mr. Oliver's car.

134.    Coming up empty-handed, the officers allowed Mr. Oliver and his passengers to return to the vehicle after the search was completed.

135.    Mr. Oliver was not issued a traffic ticket or a summons during this interaction. Officers also never attempted to measure the degree of tints on Mr. Oliver's car.

### *October 16, 2024*

136.    On October 16, 2024, at or around 8:20 PM, Mr. Oliver was driving in Manhattan on Columbus Avenue at or near the corner of 86th Street.

137.    Approximately three uniformed NYPD officers traveling in an unmarked vehicle stopped Mr. Oliver. NYPD paperwork indicates that one of the officers involved in this encounter with Mr. Oliver is Officer Michael Laduca. The identities of the other officers (Officer John Doe 8 and Officer John Doe 9) are unknown to Mr. Oliver.

138.    After pulling over Mr. Oliver, the officers informed Mr. Oliver that they had pulled him over because his windows were allegedly tinted beyond the legal limit. Officers also instructed Mr. Oliver and his passenger to step out of the car.

139.    Mr. Oliver and his passenger complied and stepped outside the vehicle. The officers then proceeded to search Mr. Oliver's car without his consent.

140.    The NYPD officers allowed Mr. Oliver and his passenger to return to his car after the search produced no weapons or illegal contraband.

141.    Mr. Oliver was not issued a traffic ticket or a summons during this interaction. The officers also never attempted to measure the degree of tints on Mr. Oliver's car.

142.    Officer Laduca completed a Vehicle Report to document this interaction. However, no corresponding Stop Report was completed.

### August 17, 2024

143.    On or around August 17, 2024, at or around 2:38 AM, Mr. Oliver was driving in the Bronx on Webb Avenue at or near the corner of Sedgwick Avenue with one passenger.

144.    Approximately two NYPD officers in an unmarked vehicle stopped Mr. Oliver. NYPD paperwork indicates that one of the officers involved in this encounter with Mr. Oliver was Officer Malik Claybrooks. The identity of the other officer (Officer John Doe 10) is unknown to Mr. Oliver.

145.    The officers informed Mr. Oliver that they stopped him because his windows were allegedly tinted beyond the legal limit.

146.    The officers ordered Mr. Oliver and his passenger out of his vehicle and searched his car without his consent.

147.    The officers allowed Mr. Oliver and his passenger to return to his car after the search produced no guns or illegal contraband.

148.    Officer Claybrooks completed a Vehicle Report for this interaction. Officer Claybrooks was assigned to a Community Response Team at the time of this interaction with Mr. Oliver.

149.    The Vehicle Report completed by Officer Claybrooks confirms that officers searched Mr. Oliver's vehicle, and that they did so without his consent.

150.    The officers failed to complete an accompanying Stop Report.

151.    Mr. Oliver was not issued a traffic ticket or a summons during this interaction. Officers also never attempted to measure the degree of tints on Mr. Oliver's car.

*Notice of Claim*

152.    Mr. Oliver has complied with the requirements of New York State General Municipal Law § 50-e by timely serving a notice of claim on the Defendants, which the Defendants have failed to adjust or pay.  He served his notice of claim on April 10, 2025.

### Plaintiff Justin Cohen

153.    Justin Cohen is a 35-year-old Black New Yorker who resides in Westchester County.

154.    At approximately 1:44 AM on May 3, 2023, Mr. Cohen was driving a rental car with New Jersey license plates in the Bronx near East Fordham Road. Mr. Cohen was driving with his friend, who is also a Black man, in the passenger seat. Mr. Cohen was wearing a black hoodie and a durag.

155.     After turning a corner onto Fordham Road, four NYPD officers traveling in an unmarked black vehicle driven by Officer Anthony Saline pulled over Mr. Cohen's vehicle. The other three officers in the unmarked NYPD vehicle were Officer John Batule, Officer Bryan Scheblein, and Officer Brendan Latimer.

156.    Officers Saline, Batule, and Scheblein were assigned to the Patrol Borough Bronx South PST at the time of Mr. Cohen's vehicle stop.[4] All four of these officers participated in the illegal conduct that injured Mr. Cohen.

157.    Officer Saline approached Mr. Cohen's vehicle on the driver's side and Officer Batule approached on the passenger side. Officer Saline asked for Mr. Cohen's license, insurance and registration, which Mr. Cohen provided.

158.    Officer Saline began to ask Mr. Cohen where he was coming from and where he lived while shining his flashlight into the car at Mr. Cohen.

159.    Officer Saline then abruptly ordered Mr. Cohen to step out of the car and opened the driver's side door.

160.    As Mr. Cohen exited the vehicle, Officer Saline grabbed Mr. Cohen's wrists and began asking Mr. Cohen whether he was carrying any weapons. Mr. Cohen insisted he did not have a firearm and told Officer Saline he did not need to be aggressive.

161.    Officer Saline then forcibly turned Mr. Cohen to face the vehicle and frisked Mr. Cohen with the assistance of Officer Scheblein.

162.    After calling for additional officers over his radio, Officer Saline instructed Mr. Cohen, "Listen, this is how you're going to go home ok, I have to make sure there's no weapons on you." Mr. Cohen informed the officers that what the officers were doing to him was illegal.

163.    After completing an extensive frisk of Mr. Cohen, Officer Saline and Officer Scheblein moved Mr. Cohen to the area behind his rental car.

---

[4] Officer Latimer was transferred to Patrol Bureau Bronx South PST at some point after the May 3, 2023 incident involving Mr. Cohen.

164.    While officers detained Mr. Cohen behind his car, Officer Batule searched Mr. Cohen's car from the passenger's side. At the same time, Officer Saline searched the car from the driver's side.

165.    Officer Saline and Officer Batule looked under the seats, in the glove compartment, and in the center console. They rummaged through Mr. Cohen's belongings and Officer Saline unzipped Mr. Cohen's closed backpack that was lying in the backseat. Officer Saline extensively searched the contents of the backpack for over one minute.

166.    At some point after the traffic stop began, additional officers arrived at the scene, including Officer Jorge Perez at or around 1:48 AM, Sergeant Zhong Ying at or around 1:48 AM, Officer Charnel Tabon at or around 1:53 AM, and Officer Gustavo Santana at or around 1:53 AM.

167.    After additional officers arrived at the scene, Officer Saline informed Mr. Cohen that they were going to take him back to the precinct. Officers Saline, Batule, Perez, and Tabon placed Mr. Cohen in handcuffs.

168.    Officer Batule and Officer Perez escorted Mr. Cohen in handcuffs to an unmarked NYPD vehicle where officers continued to speak to and question Mr. Cohen while he sat on the edge of the backseat with the door open and his feet on the pavement.

169.    Mr. Cohen repeatedly asked Officer Batule why he was under arrest, to which Officer Batule insisted that Mr. Cohen was not under arrest and was being detained while they completed their investigation.

170.    Mr. Cohen then asked what the officers were investigating, to which Officer Saline replied: "We have to make sure that there's no weapons in the car."

171.    Roughly twenty minutes after the initial traffic stop, Officer Saline and Officer Batule transported Mr. Cohen to the 48th Precinct in the Bronx.

172.    Officer Scheblein then entered Mr. Cohen's car and drove it to the 48th Precinct.

173.    At the 48th Precinct, Officer Saline informed Mr. Cohen that all he was going to get was a traffic summons.

174.    Despite informing Mr. Cohen that he would only receive a traffic summons, Officer Batule and Officer Saline escorted Mr. Cohen to the jail cells in the 48th Precinct and locked him in a cell.

175.    While removing the handcuffs from Mr. Cohen before locking him in the cell, Officer Batule informed him: "We're gonna complete our investigation. Then, everything checks out, you guys will get your car, and you'll be on your way. So, just cooperate with us."

176.    At or around the same time that Mr. Cohen was inside the 48th Precinct, Officer Scheblein arrived outside the 48th Precinct in Mr. Cohen's vehicle that he had seized, and he began searching the vehicle.

177.    Officer Scheblein rummaged through the glove compartment and looked around the front seats. Next, he began searching through Mr. Cohen's backpack that was still in the backseat of the vehicle. Officer Schleblein then searched in the seat pockets and under the seat.

178.    Officer Scheblein then searched the trunk, which was full of bags of clothing and personal items. Officer Scheblein searched every single bag one by one, manipulating the exterior of bags, opening bags, and searching every corner of Mr. Cohen's personal suitcase—examining his clothing and documents, and removing other personal items for additional inspection. After removing items from the trunk, Officer Scheblein looked under the trunk mat in and throughout the space where the spare tire was stored.

179.    After searching the trunk and finding no firearms or contraband, Officer Scheblein put all of the removed personal items and bags back into the trunk. Officer Scheblein then proceeded to again search under and around all of the seats in the vehicle.

180.    At this point, Officers Batule, Saline, and Latimer arrived and the four officers together searched under the hood of the vehicle and examined the engine.

181.    The entirety of the vehicle search that officers conducted at the precinct lasted at least seventeen minutes. Officers never recovered a firearm, weapon, or any other contraband as a result of their searches of Mr. Cohen and his rental vehicle.

182.    Police ultimately released Mr. Cohen from the cell and left him to sit in the precinct with no instructions for roughly 10-15 minutes. Then, at or around 3:04 AM, police gave Mr. Cohen the keys to his rental car and a traffic ticket for allegedly speeding. Officers did not issue Mr. Cohen a criminal summons or provide any additional paperwork.

183.    Mr. Cohen challenged the speeding ticket and a traffic court judge in the Bronx dismissed the ticket on May 23, 2025.

184.    NYPD records admit that an officer searched and frisked Mr. Cohen and that officers searched his rental vehicle.

185.    Defendant Officer Batule also submitted paperwork that incorrectly stated that Mr. Cohen consented to the search of his vehicle. The report claimed that Mr. Cohen gave the NYPD consent to search his vehicle upon being asked by Officer Saline. However, body camera video shows that when an officer asked Mr. Cohen if he was allowing the officers to search his vehicle, Mr. Cohen clearly and unequivocally replied, "No, I'm not." The Stop Report and Vehicle Report submitted by Officer Latimer also incorrectly state that Mr. Cohen consented to a search of his vehicle.

186.    Officers lacked any legitimate reason for suspecting that Mr. Cohen was armed or that there was a weapon in his rental vehicle. Instead, the officers' unfounded belief that Mr. Cohen was armed was motivated by racial discrimination and the searches of his car were performed pursuant to the Vehicle Search Policy.

187.    Mr. Cohen filed a complaint with the CCRB over this incident against the four officers who initiated the stop and search of his vehicle. The CCRB substantiated Mr. Cohen's allegations against Officers Batule, Scheblein, and Latimer. The allegations substantiated against Officer Batule are: two allegations of Abuse of Authority – Bias-Based Policing (Race); Abuse of Authority – Frisk; Abuse of Authority – Other; Abuse of Authority – Question; Abuse of Authority – Vehicle search. The allegations substantiated against Officer Scheblein are: two allegations of Abuse of Authority – Bias-Based Policing (Race); Abuse of Authority – Vehicle search. The allegations substantiated against Officer Latimer are: two allegations of Abuse of Authority – Bias-Based Policing (Race); Abuse of Authority – Frisk.

188.    The CCRB referred the case to the Administrative Prosecution Unit and charges were filed against Officer Batule, Officer Scheblein, and Officer Latimer.[5] As of December 29, 2025, at least one of these three officers filed a plea that is awaiting approval.

189.    The NYPD's failure to discipline, supervise, and train the officers involved in the violation of Mr. Cohen's civil rights contributed to his injuries. Officers Saline, Batule, Scheblein, and Latimer all have extensive disciplinary histories, including multiple allegations of misconduct

---

[5] Officer Saline is no longer employed by the NYPD and therefore the CCRB did not reach a conclusion with respect to the allegations against him that arose from Mr. Cohen's complaint. However, the allegations he faced as a result of Mr. Cohen's complaint were: Abuse of Authority – Frisk; Abuse of Authority – Other; Abuse of Authority – Other; Abuse of Authority – Other; Abuse of Authority – Other; Abuse of Authority – Question; Abuse of Authority – Vehicle search.

substantiated by the CCRB. Mr. Cohen submitted a notice of claim pursuant to New York State General Municipal Law § 50-e on September 18, 2023

**NAACP NYS Has and Will Continue to Be Injured by the Vehicle Search Policy.**

190.    The NAACP NYS is a non-partisan organization with 12,000 members and over 50 branches, college chapters, and youth councils across the state of New York. It is the state affiliate of the NAACP, the oldest civil rights group in the United States dedicated to advancing the rights of Black Americans and other minorities, including Latinos.

191.    Formed in 1936, NAACP NYS's mission is to ensure political, educational, and economic justice for Black Americans and all people of color. In furtherance of that mission, NAACP NYS works to remove all barriers of racial discrimination, primarily through organizing and engaging in legislative advocacy work in the fields of criminal, economic, and environmental justice, as well as in education, health, and civic engagement.

192.    NAACP NYS has 11 branches across New York City's five boroughs (the "Branches"), which represent approximately 4,000 members, the majority of whom are Black residents of New York City. NAACP NYS and the Branches also have Latino members.

193.    The Branches inform NAACP NYS about what is going on in their communities and NAACP NYS will in turn provide support to the Branches in meeting the needs of their memberships by helping the Branches fundraise, direct operations, and develop trainings. Thus, the on-the-ground needs of the New York City Branches impact how the NAACP NYS deploys resources.

194.    Members also contact NAACP NYS directly when they have experienced an issue of racial discrimination. Although NAACP NYS and the Branches act as a resource for the Black community, they are not direct service providers. Neither the NAACP NYS nor the Branches have dedicated direct-response teams or intake lines to field member concerns relating to unlawful

policing practices. Thus, NAACP NYS staff have to divert time and resources away from the organization's core activities, like legislative advocacy, in order to respond to member concerns and refer callers to resources that can provide support.

195.    In recent years, NAACP NYS has experienced a significant uptick in the number of member complaints relating to unlawful vehicle searches because of the NYPD's Vehicle Search Policy. NAACP NYS has and is continuing to receive such complaints both directly from members, as well as from the Branches. This is particularly true of Branches in areas with high numbers of vehicle searches.

196.    For example, within the last month alone, NAACP NYS leadership has received multiple calls specifically pertaining to unconstitutional vehicle searches conducted by the NYPD in Queens, New York. Likewise, the Branches have received many complaints of unlawful, pretextual vehicle searches, which they have reported up to NAACP NYS.

197.    As a result of the significant increase in calls generated by the Vehicle Search Policy, NAACP NYS and the Branches have had to and continue to divert resources away from their other objectives and initiatives in order to field member calls, refer those individuals to the appropriate resources, and, in certain instances, to speak directly with NYPD officers on behalf of aggrieved individuals. When NAACP NYS leadership and staff are handling calls from members, they cannot engage in their core organizing and advocacy work.

198.    The increase in community concern has been significant enough that NAACP NYS and the Branches have begun diverting resources on a state-wide scale toward previously unbudgeted and unplanned-for advocacy activities in an effort to respond to the unlawful Vehicle Search Policy.

199.    For example, on January 14, 2025, the Jamaica Branch hosted a "Know Your Rights: What to Do When Stopped by the Police" training event.  This event was specifically focused on discussing traffic stops and individuals' rights when an NYPD officer asks drivers or passengers to exit a vehicle, subjects them to a frisk, or searches the car.  NAACP NYS supported the Jamaica Branch with organizational and financial resources, which, absent the unlawful policing policies described herein, NAACP NYS would have deployed toward other Branches and/or initiatives.

200.    NAACP NYS is also diverting resources toward updating educational materials and printing and distributing Know Your Rights cards, which will provide information on individuals' rights during traffic stops and vehicle searches. The resources dedicated to this cause, including NAACP NYS's monetary resources, come at the expense of other policy priorities of the organization and its members.

201.    NAACP NYS has also targeted its advocacy efforts with elected officials and other stakeholders toward addressing the illegal Vehicle Search Policy instead of other policy priorities of the organization, like affordable housing, diversity in hiring practices, and improvements in public education.  NAACP NYS has limited opportunities to express its policy concerns with these elected officials and stakeholders, so the need to address its members' experiences and concerns with the Vehicle Search Policy has diminished NAACP NYS's ability to effectively achieve its objectives across the full spectrum of its mission.

202.    In response to the discriminatory Vehicle Search Policy and the resulting community concerns, NAACP NYS has been, and will continue to be, forced to divert its limited financial, volunteer, and other organizational resources away from its planned priorities, initiatives, and activities.

## JURISDICTION AND VENUE

203.    This Court has subject-matter jurisdiction over the plaintiffs' claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3)-(4).

204.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the plaintiffs' claims occurred in this district.

## CLAIMS

### First Cause of Action – Fourth Amendment

205.    The plaintiffs reallege all preceding paragraphs.

206.    As described in those paragraphs, Defendants' actions, including the NYPD's policy and practice of searching the vehicles of drivers without the requisite probable cause or reasonable suspicion, violate the Fourth Amendment to the United States Constitution. This claim is brought pursuant to 42 U.S.C. § 1983.

207.    As to Plaintiff Christopher Oliver, the actions of Defendants the City of New York, Commissioner Jessica Tisch, Chief Michael LiPetri, and the individual officers identified in paragraphs 105-151 of this complaint, including the four instances described above in which NYPD officers, pursuant to the Vehicle Search Policy, searched Mr. Oliver's vehicle without the requisite probable cause or reasonable suspicion, violated the Fourth Amendment to the United States Constitution.

208.    As to Plaintiff Justin Cohen, the actions of Defendants the City of New York, Commissioner Jessica Tisch, Chief Michael LiPetri, and the individual officers identified in paragraphs 153-189 of this complaint, including the instance described above in which NYPD officers, pursuant to the Vehicle Search Policy, searched Mr. Cohen's vehicle without the requisite probable cause or reasonable suspicion, violated the Fourth Amendment to the United States Constitution.

209.     Organizational Plaintiff NAACP NYS alleges that the actions of Defendants the City of New York, Commissioner Jessica Tisch, and Chief Michael LiPetri, as described in this complaint, including their adoption and implementation of the NYPD's policy and practice of searching the vehicles of drivers without the requisite probable cause or reasonable suspicion, violates the Fourth Amendment to the United States Constitution.  For the reasons alleged in paragraphs 190-202, this policy and practice has harmed, and continues to harm the NAACP NYS, which has been required to divert resources to address the Vehicle Search Policy

### Second Cause of Action – Fourteenth Amendment

210.     The plaintiffs reallege all preceding paragraphs.

211.     As described in those paragraphs, Defendants' actions, including the NYPD's policy and practice of intentionally searching the vehicles of Black and Latino drivers' vehicles based on race, violate the Fourteenth Amendment to the United States Constitution. This claim is brought pursuant to 42 U.S.C. § 1983.

212.     As to Plaintiff Christopher Oliver, the actions of Defendants the City of New York, Commissioner Jessica Tisch, Chief Michael LiPetri, and the individual officers identified in paragraphs 105-151 of this complaint, including the four instances described above in which NYPD officers, pursuant to the Vehicle Search Policy, searched Mr. Oliver's vehicle based on his race, violated the Fourteenth Amendment to the United States Constitution.

213.     As to Plaintiff Justin Cohen, the actions of Defendants the City of New York, Commissioner Jessica Tisch, Chief Michael LiPetri, and the individual officers identified in paragraphs 153-189 of this complaint, including the instance described above in which NYPD officers, pursuant to the Vehicle Search Policy, searched Mr. Cohen's vehicle based on his race, violated the Fourteenth Amendment to the United States Constitution.

214.    Organizational Plaintiff NAACP NYS alleges that the actions of Defendants the City of New York, Commissioner Jessica Tisch, and Chief Michael LiPetri, as described in this complaint, including their adoption and implementation of the NYPD's policy and practice of searching the vehicles of drivers based on race, violates the Fourteenth Amendment to the United States Constitution.  For the reasons alleged in paragraphs 190-202, this policy and practice has harmed, and continues to harm, the NAACP NYS, which has been required to divert resources to address the Vehicle Search Policy

### Third Cause of Action – New York State Constitution, Article 1, Section 12 (Unreasonable Search)

215.    The plaintiffs reallege all preceding paragraphs.

216.    As described in those paragraphs, Defendants' actions, including the NYPD's policy and practice of searching the vehicles of drivers without the requisite probable cause or reasonable suspicion, violate the protections against unreasonable searches found in Article 1, Section 12 of the New York State Constitution.

217.    As to Plaintiff Christopher Oliver, the actions of Defendants the City of New York, Commissioner Jessica Tisch, Chief Michael LiPetri, and the individual officers identified in paragraphs 105-151 of this complaint, including the four instances described above in which NYPD officers, pursuant to the Vehicle Search Policy, searched Mr. Oliver's vehicle without the requisite probable cause or reasonable suspicion, violated Article 1, Section 12 of the New York State Constitution.

218.    As to Plaintiff Justin Cohen, the actions of Defendants the City of New York, Commissioner Jessica Tisch, Chief Michael LiPetri, and the individual officers identified in paragraphs 153-189 of this complaint, including the instance described above in which NYPD officers, pursuant to the Vehicle Search Policy, searched Mr. Cohen's vehicle without the requisite

probable cause or reasonable suspicion, violated Article 1, Section 12 of the New York State Constitution.

219.    Organizational Plaintiff NAACP NYS alleges that the actions of Defendants the City of New York, Commissioner Jessica Tisch, and Chief Michael LiPetri, as described in this complaint, including their adoption and implementation of the NYPD's policy and practice of searching the vehicles of drivers without the requisite probable cause or reasonable suspicion, violates Article 1, Section 12 of the New York State Constitution.  For the reasons alleged in paragraphs 190-202, this policy and practice has harmed, and continues to harm, the NAACP NYS, which has been required to divert resources to address the Vehicle Search Policy.

### Fourth Cause of Action – New York State Constitution, Article 1, Section 11 (Equal Protection/Race Discrimination)

220.    The plaintiffs reallege all preceding paragraphs.

221.    As described in those paragraphs, Defendants' actions, including the NYPD's policy and practice of searching the vehicles of Black and Latino drivers' vehicles based on race, impermissibly discriminates on the basis of race in violation of Article I, Section 11 of the New York Constitution.

222.    As to Plaintiff Christopher Oliver, the actions of Defendants the City of New York, Commissioner Jessica Tisch, Chief Michael LiPetri, and the individual officers identified in paragraphs 105-151 of this complaint, including the four instances described above in which NYPD officers, pursuant to the Vehicle Search Policy, searched Mr. Oliver's vehicle based on race, violated Article I, Section 11 of the New York Constitution.

223.    As to Plaintiff Justin Cohen, the actions of Defendants the City of New York, Commissioner Jessica Tisch, Chief Michael LiPetri, and the individual officers identified in paragraphs 153-189 of this complaint, including the instance described above in which NYPD

officers, pursuant to the Vehicle Search Policy, searched Mr. Cohen's vehicle based on race, violated Article I, Section 11 of the New York Constitution.

224.    Organizational Plaintiff NAACP NYS alleges that the actions of Defendants the City of New York, Commissioner Jessica Tisch, and Chief Michael LiPetri, as described in this complaint, including their adoption and implementation of the NYPD's policy and practice of searching the vehicles of drivers based on race, violates Article 1, Section 11 of the New York State Constitution.  For the reasons alleged in paragraphs 190-202, this policy and practice has harmed, and continues to harm, the NAACP NYS, which has been required to divert resources to address the Vehicle Search Policy.

### Fifth Cause of Action – Community Safety Act (Bias-Based Profiling)

225.    The plaintiffs reallege all preceding paragraphs.

226.    As described in those paragraphs, Defendants' actions, including the NYPD's policy and practice of searching the vehicles of Black and Latino drivers' vehicles based on race, constitute unlawful bias-based profiling in violation of the Administrative Code of the City of New York § 14-151 (Bias-based Profiling Prohibited) (the "Community Safety Act"), which, among other things, prohibits "a member of the force of the police department or other law enforcement officer" from "rel[ying] on actual or perceived race . . . as the determinative factor in initiating law enforcement action against an individual," and which prohibits the NYPD itself from engaging in such profiling.

227.    As to Plaintiff Christopher Oliver, the actions of Defendants the City of New York, Commissioner Jessica Tisch, Chief Michael LiPetri, and the individual officers identified in paragraphs 105-151 of this complaint, including the four instances described above in which NYPD officers, pursuant to the Vehicle Search Policy, searched Mr. Oliver's vehicle based on race, violated the Community Safety Act.

228.    As to Plaintiff Justin Cohen, the actions of Defendants the City of New York, Commissioner Jessica Tisch, Chief Michael LiPetri, and the individual officers identified in paragraphs 153-189 of this complaint, including the instance described above in which NYPD officers, pursuant to the Vehicle Search Policy, searched Mr. Cohen's vehicle based on race, violated the Community Safety Act.

229.    Organizational Plaintiff NAACP NYS alleges that the actions of Defendants the City of New York, Commissioner Jessica Tisch, and Chief Michael LiPetri, as described in this complaint, including their adoption and implementation of the NYPD's policy and practice of searching the vehicles of drivers based on race, violate the Community Safety Act.  For the reasons alleged in paragraphs 190-202, this policy and practice has harmed, and continues to harm, the NAACP NYS, which has been required to divert resources to address the Vehicle Search Policy.

## PRAYER FOR RELIEF

WHEREFORE, the plaintiffs request that this Court:

A.  Assume jurisdiction over this matter;

B.  Declare that the Vehicle Search Policy violates the Fourth Amendment of the United States Constitution and Article I, Section 12 of the New York Constitution;

C.  Declare that the Vehicle Search Policy violates the Fourteenth Amendment of the United States Constitution and Article I, Section 11 of the New York Constitution;

D.  Declare that the Vehicle Search Policy violates the Administrative Code of the City of New York § 14-151.

E.  Enjoin further violations of constitutional rights and rights under the Administrative Code of the City of New York § 14-151 pursuant to the Vehicle Search Policy, including but not limited to an injunction that:

   a.  Prohibits NYPD officers from unlawfully searching the vehicles of drivers; and

b. Requires Defendant City of New York to establish appropriate standards governing when NYPD officers may search a vehicle;

F. Award compensatory damages for injuries sustained by the individual plaintiffs;

G. Award the plaintiffs reasonable attorneys' fees and costs.

H. Grant any other relief the Court deems appropriate.

Dated: January 28, 2026
New York, New York

Respectfully Submitted,

NEW YORK CIVIL LIBERTIES UNION
FOUNDATION, by:

Daniel R. Lambright
Thomas Munson
Elizabeth Gyori
Ifeyinwa K. Chikezie
Robert Hodgson
Molly K. Biklen
125 Broad St., 19th Floor
New York, NY 10004
Tel: (212) 607-3300
dlambright@nyclu.org

THE BRONX DEFENDERS, by:

Anne Venhuizen
Trisha Trigilio
360 E. 161st Street
Bronx, New York 10451
Tel: (718) 838-7878
annev@bronxdefenders.org

MILBANK LLP, by:

Katherine Kelly Fell
Nicole D. Valente
Ariadne M. Ellsworth
55 Hudson Yards
New York, NY 10001

Tel: (212) 530-5000
kfell@milbank.com
nvalente@milbank.com

*Counsel for Plaintiffs*